I. Introduction
Cassandra Wilson ("Plaintiff") brought this putative class action on behalf of herself and similarly situated employees of Edison International, Inc. ("Edison"). The putative class consists of those Edison employees who, through their participation in the Edison 401(k) Savings Plan (the "Plan"), invested in the Edison International Stock Fund from March 27, 2014 through June 24, 2015 (the "Class Period"). Second Amended Complaint ("SAC"), Dkt. 81. Plaintiff claims that Theodore Craver ("Defendant Craver") and Robert Boada ("Defendant Boada") (collectively, "Defendants") each of whom had certain alleged responsibilities with respect to the administration of the Plan, breached their respective duties of prudence imposed by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1104(a)(1)(B).[1]
After a motion to dismiss the initial Complaint was granted (Dkt. 52), Plaintiff filed a First Amended Complaint ("FAC"). Dkt. 53. Defendants filed a motion to dismiss the FAC. Dkt. 61. After the Court granted the motion to dismiss the FAC, with leave to amend (Dkt. 80), Plaintiff filed the SAC. Dkt. 81. Defendants thereafter filed a Motion to Dismiss the SAC ("Motion"). Dkt. 88. Plaintiff filed an opposition to the Motion (Dkt. 93), and Defendants replied (Dkt. 94).
On October 23, 2017, a hearing was held on the Motion and it was taken under submission. Dkt. 96. For the reasons stated in this Order, the Motion is GRANTED .
II. Factual Background
A. The Edison 401(k) Plan and the Edison International Stock Fund
Edison is the parent company of Southern California Edison Company ("SCE"), which supplies electricity to customers in Southern California. SAC ¶ 52. SCE is regulated by the California Public Utilities Commission ("CPUC") and by the Federal Energy Regulatory Commission ("FERC"). Id. ¶ 2.
Certain employees of Edison, SCE and other Edison subsidiaries are eligible to participate in the Plan. Id. ¶ 45. The Plan is sponsored by SCE and is administered by the Benefits Committee of SCE.
*1179 Request for Judicial Notice ("RJN"), Dkt. 88-3 (Ex. 1 at 49). Those employees who elect to participate in the Plan may direct that a percentage of their earnings be invested in one or more funds offered by the Plan. Id. at 16. In general, income taxes are deferred on the amounts that are invested by a participating employee. The investment options that are provided to participants in the Plan are selected by the Trust Investment Committee of Edison. Id. at 54. Defendant Craver, who was the Chief Executive Officer ("CEO") of Edison throughout the Class Period, appointed the members of the Trust Investment Committee during the Class Period. Id. at 14; SAC ¶¶ 18-19, 41. Defendant Boada was at all relevant times the Vice President and Treasurer of Edison and a member of the Trust Investment Committee. SAC ¶¶ 18, 43.
During the Class Period, the Edison International Stock Fund (the "Stock Fund") was among the investment options available to Plan participants. Id. ¶ 16. The Stock Fund is an Employee Stock Ownership Plan ("ESOP") whose largest holding is in Edison common stock. RJN, Dkt. 88-4 (Ex. 2 at 9-10, 34).
B. The CPUC Proceedings and the November 2014 Settlement
In 2013, SCE retired the San Onofre Nuclear Generating Station ("SONGS"). SAC ¶ 55. As part of this process, SCE participated in several rate setting proceedings before the CPUC. Their purpose was to determine how costs associated with the closing of the SONGS would be allocated between SCE and California ratepayers. Id. ¶ 57. As a result of these proceedings, in October 2012, the CPUC issued an Order Instituting Investigation proceeding ("Proceeding"). Several advocacy groups, including the Office of Ratepayer Advocates ("ORA"), the Utility Reform Network ("TURN") and the Alliance for Nuclear Responsibility ("ANR") participated in the Proceeding. Id. ¶¶ 58-59. The Proceeding continued for approximately two years. Id. ¶¶ 58-63. Certain matters that arose during the process led to proceedings before two Administrative Law Judges, Melanie Darling ("ALJ Darling") and Kevin Dudney ("ALJ Dudney"). Id.
In November 2014, the CPUC approved a settlement agreement among SCE and the advocacy groups (the "SONGS Settlement"), finding that it was "in the public interest." Id. ¶¶ 62-63, 65. CPUC proceedings are governed by the Public Utility Code (the "Code") and by the CPUC Rules of Practice and Procedure (the "Rules"). Id. ¶ 69. The Code and the Rules provide specific limitations on ex parte communications between certain parties and CPUC personnel. Id. Rule 8.1 of the Rules defines an ex parte communication:
(c) "Ex parte communication" means a written communication (including a communication by letter or electronic medium) or oral communication (including a communication by telephone or in person) that:
(1) concerns any substantive issue in a formal proceeding,
(2) takes place between an interested person and a decisionmaker, and
(3) does not occur in a public hearing, workshop, or other public forum noticed by ruling or order in the proceeding, or on the record of the proceeding. Communications regarding the schedule, location, or format for hearings, filing dates, identity of parties, and other such nonsubstantive information are procedural inquiries, not ex parte communications.
RJN, Dkt. 88-6 (Ex. 4 at 7).
Rule 8.4 provides that in a ratesetting proceeding an "interested person," which is a term used in Rule 8.1, must report any ex parte communication within three working days of when it occurred. Id. at 11 ("Ex parte communications that are subject *1180 to these reporting requirements shall be reported by the interested person, regardless of whether the communication was initiated by the interested person. Notice of ex parte communications shall be filed within three working days of the communication."). The rules do not define "substantive issue." However, they do provide that "[c]ommunications regarding the schedule, location, or format for hearings, filing dates, identity of parties, and other such nonsubstantive information are procedural inquiries, not ex parte communications." Id. at 7.
C. Disclosure of Certain Communications
1. Email to Edison Personnel
In September 2014, approximately two months before the CPUC approved the SONGS Settlement, the Chief Ethics and Compliance Officer of Edison sent an email to Edison personnel. SAC ¶ 71. It stated: "While we are well aware of the CPUC's ex parte communications rules, this situation makes clear that awareness of the rules is not enough." Id.
2. The Warsaw Meeting
In February 2015, approximately three months after the CPUC approved the SONGS Settlement, SCE provided written notice to the CPUC about a previously unreported ex parte communication between Stephen Pickett ("Pickett"), the former Executive Vice President of SCE, and Michael Peevey ("Peevey"), the former President of the CPUC. Id. ¶¶ 8, 68. The communication occurred in March 2013, at an industry conference in Warsaw, Poland (the "Warsaw Meeting"). Id. ¶¶ 68, 72. At that time, although the CPUC proceedings were ongoing, the settlement negotiations had not commenced. Id. ¶ 68.
Before the February 2015 notice of the ex parte communication, the following had occurred: (i) Peevey had resigned from the CPUC, effective December 2014; (ii) the California Attorney General had seized handwritten notes from the Warsaw Meeting during a January 2015 search of Peevey's residence; and (iii) Edison had implemented its first policy regarding ex parte communications. Id. ¶ 73.
Approximately two weeks after the February 2015 disclosure to the CPUC, Edison filed a Form 10-K with the Securities and Exchange Commission ("SEC"). Id. ¶ 76. The Form 10-K, which is an annual financial report, included financial results for the fourth quarter of 2014 and fiscal year 2014. It disclosed the following:
On February 9, 2015, SCE filed in the OII proceeding a Late-Filed Notice of Ex Parte Communication regarding a meeting in March 2013 between an SCE senior executive and the president of the CPUC, both of whom have since retired from their respective positions. In response, the Alliance for Nuclear Responsibility, one of the intervenors in the OII, filed an application requesting that the CPUC institute an investigation into whether sanctions should be imposed on SCE in connection with the ex parte communication. The application requests that the CPUC order SCE to produce all ex parte communications between SCE and the CPUC or its staff since January 31, 2012 and all internal SCE unprivileged communications that discuss such ex parte communications.
Id.
3. Other Meetings
In April 2015, ALJ Darling and ALJ Dudney ordered SCE to provide additional information about its disclosure of the ex parte communication that occurred at the Warsaw Meeting. Id. ¶ 79. The ruling stated that "[t]he Late-Filed Ex Parte Notice [filed by Edison in February 2015] offered little information about the content of the meeting between Commission President *1181 Peevey and SCE's Executive Vice President."Id. It directed SCE to provide the following information to the CPUC by April 29, 2015: (i) documents related to any oral or written communications between any SCE employee and CPUC decisionmakers between March 1, 2013 and November 31, 2014, concerning the potential settlement of the SONGS Proceeding; and (ii) all internal written communications that reported, discussed, referred to, or otherwise contained a description of any oral or written communications about the settlement with CPUC decisionmakers. Id. The ruling also directed SCE to file notices of any previously undisclosed communications, which had been discovered, or any other oral or written ex parte communications relating to the substantive issues described in the Proceeding. Id.
On April 29, 2015, SCE responded to the ruling. Id. ¶ 83. It allegedly produced "hundreds of pages of previously undisclosed ex parte communications (the 'April 29, 2015 Filing') implicating nearly all of Edison's most senior officers." Id. The SAC also alleges that these documents were located in archived emails of approximately 13 officers of Edison. Id. The emails were located through the use of search terms. Id. The April 29, 2015 Filing also included a declaration by Pickett. Id. ¶ 84. The SAC alleges that in this declaration, Edison revealed that, as early as April 2013, Pickett had briefed senior Edison executives, including Defendant Craver, about the ex parte communications at the Warsaw Meeting. Id.
After the April 2013 briefing, Pickett sent an email to the senior executives that included a document titled "Elements of a SONGS Deal." Id. ¶ 85. This document summarized the ex parte communication that had occurred at the Warsaw Meeting. Id. In his declaration, Pickett also stated that this document was "intended to be an internal outline that could serve as a basis for discussing a potential settlement in a deal with consumer and other groups should SCE's efforts to restart SONGS prove unsuccessful." Id.
The April 29, 2015 Filing also disclosed that, during June 2013, Defendant Craver sent an email that referred to "two improper substantive ex parte contacts with Peevey to Edison directors Jagjeet Bindra, Richard Schlosberg, Peter Taylor, and Brett White." Id. ¶ 86. The April 29, 2015 Filing also disclosed certain communications between Edison and the CPUC regarding the Greenhouse Gas Initiative. Id. ¶ 87. That initiative was a project that was to be undertaken at the University of California, Los Angeles ("UCLA") where Peevey held an advisory post. Id. ¶¶ 87-88, 91. In the declaration of Ron Litzinger ("Litzinger"), a former SCE President, he states that he attended a meeting with Peevey and former CPUC Commissioner Michael Florio ("Commissioner Florio") in May 2014. Litzinger then states:
Peevey stated he was pleased with the SONGS settlement. President Peevey stated that I probably knew he had talked to Mr. Pickett in Poland. President Peevey waved a set of handwritten notes, but did not give me the notes to read ... President Peevey told me that the settlement was missing a provision to address the greenhouse gas impacts of the SONGS retirement, and he asked SCE to make a voluntary contribution to the University of California ("UC"), specifically UCLA, for greenhouse gas research. President Peevey stated the contribution should total $25 million over five years, with $4 million a year coming from SCE and $1 million a year coming from SDG & E.
Id. ¶ 87 (alteration in original).
Litzinger's declaration also disclosed several other communications between Edison and the CPUC related to the *1182 Greenhouse Gas Initiative. These occurred during the SONGS negotiations as to the Proceeding. Id. ¶ 88. They included a June 2014 meeting between Peevey and Defendant Craver. Id.
D. The CPUC's Response to the Disclosures
In June 2016, TURN filed an application with the CPUC. SAC ¶ 92. It charged SCE with "fraud by concealment" and urged the CPUC to set aside the SONGS Settlement. Id. Subsequently, ALJ Darling issued a ruling in an email that directed SCE to produce additional information about certain of the disclosed communications that had occurred between January 2013 and June 2014. Id. ¶ 93. Edison responded by producing 43 additional documents. Id.
In August 2015, ALJ Darling issued a ruling on the TURN application (the "ALJ Ruling"). Id. ¶ 95. It determined that SCE had failed to file the required notices about each of the following ten communications, each of which was deemed an ex parte communication: (i) March 26, 2013: the communication between Pickett and Peevey at the Warsaw Meeting; (ii) March 27, 2013: continued communications between Pickett and Peevey; (iii) May 28, 2013: email sent by Les Starck, Edison's Senior Vice President of Regulatory Policy and Affairs to CPUC Commissioners; (iv) May 29, 2013: conversation between Michael Hoover ("Hoover"), Edison's Senior Director of State Energy Regulation, and Carol Brown, Chief of Staff of Peevy; (v) June 26, 2013: conversation between Litzinger and Commissioner Florio; (vi) September 6, 2013: lunch meeting with Peevey, Litzinger and others; (vii) November 15, 2013: dinner meeting between Defendant Craver and Peevey; (viii) May 28, 2014: meeting between Hoover and Peevey; (ix) June 11, 2014: meeting between Hoover and Peevey; and (x) June 17, 2014: meeting between Peevey and Defendant Craver. Id. ¶ ¶ 95-96.
In December 2015, the CPUC modified in part and affirmed in part the ALJ Ruling (the "CPUC Ruling"). RJN, Dkt. 88-8 (Ex. 6). It found that SCE had failed to file required notices as to eight of the ten ex parte communications. Id. at 4. The two excluded communications were as to the meetings held on May 29, 2013 and on June 17, 2014. Id. at 15. The CPUC stated that "SCE's approach to reporting should have been more robust and favored reporting over non-reporting when it engaged in what it saw as ambiguous communications and matters of first impression." Id. at 44-45. The CPUC imposed a $16.7 million penalty on SCE; $16.5 million was for SCE's failure to report the communication that occurred during the Warsaw Meeting in violation of Rule. 8.4. Id. at 62-63.
Both the ALJ Ruling and the CPUC Ruling acknowledged that the CPUC rules about ex parte communications can be difficult to apply. ALJ Darling wrote that "[w]hether reporting is required is often a fact-specific inquiry" and noted that the CPUC "has acknowledged there may be instances where it might be difficult for parties to discern between a [non-reportable] procedural 'inquiry' that merely seeks information and a [reportable] procedural request ... that is substantive in nature." RJN, Dkt. 88-7 (Ex. 5 at 27, 38). The CPUC Ruling also stated that "one-way communications" are not reportable because they are not "between" an interested person and a decisionmaker, although whether a communication is "one-way" depends upon the nature of a party's response and whether it crosses into a "substantive" communication. RJN, Dkt. 88-8 (Ex. 6 at 13). The CPUC Ruling concluded that "SCE's argument that it could hardly be expected to know whether [certain] communications fit the definition of ex parte communications prior to the [ALJ Ruling] is not entirely without weight."Id. at 52.
*1183 E. Effect on Edison's Stock Prices
In March 2014, which is the beginning of the Class Period, Edison stock was trading at about $49 per share. SAC ¶ 100. The Complaint alleges that, as a result of SCE's "materially false and misleading statements and omissions," Edison's stock price rose to almost $65 per share, and was trading at "artificially inflated prices." Id. This rise in price was allegedly due to the "announcement of the SONGS Settlement and expectations that Edison was putting the costs and expenses of this liability behind them." Id. ¶ 101.
The SAC also alleges that other disclosures about the conduct described above caused a decline in the price of Edison stock:
On February 9, 2015, after Edison's first disclosure of its ex parte communications, its stock price fell to $62.78 per share from over $66.33 per share, then continued to correct as the truth emerged over the next few months.
On April 29, 2015, on news of Edison's additional ex parte communications, shares of Edison fell from $61.13 per share to $60.08.
On May 4, 2015, on news of the additional ex parte communications, shares of Edison declined $2.87 per share over two days of trading, or roughly 3.75%, to close at $59.60 on May 6, 2015.
On June 24, 2015, on news of TURN's application charging SCO with "fraud by concealment," shares of Edison declined $1.56 per share or over 2.70%, to close at $56.07 on June 24, 2015.
Id. ¶ 102.
F. Advocacy Group Petitions and Shareholder Litigation
In April 2015, ANR petitioned the CPUC to modify its approval of the SONGS Settlement. SAC ¶ 81. ANR asserted that SCE's failure to file a timely notice of the ex parte communications during the Warsaw Meeting undermined the basis for the CPUC's decision. Id ¶ 82. Other consumer groups made similar requests. Id. ¶¶ 92, 98. In the CPUC Ruling, a decision on these requests was deferred; it remains pending. RJN, Dkt. 88-8 (Ex. 6 at 43).
In July 2015, a putative securities class action was brought against Edison and certain of its senior officers, including Defendant Craver, in the Southern District of California (the "Securities Action"). Eng v. Edison Int'l, No. 3-15-CV-1478-BEN-KSC (S.D. Cal.) (Benitez, J.). The Complaint in Eng alleges that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(a) et seq. , by making statements that failed to disclose that unreported ex parte communications had occurred. Id. (Dkt. 1).The court there granted a motion to dismiss the complaint on September 14, 2016 with leave to amend. Id. (Dkt. 35); Eng v. Edison Int'l , 2016 WL 4793185 (S.D. Cal. Sept. 14, 2016). The court also granted a motion to dismiss the plaintiff's second amended complaint on May 5, 2017 with leave to amend. Id. (Dkt. 54); Eng v. Edison Int'l , 2017 WL 1857243 (S.D. Cal. May 5, 2017). On March 16, 2018, the court granted a motion to dismiss the third amended complaint without leave to amend, i.e. , it dismissed the amended complaint with prejudice. Id. (Dkt. 65); Eng v. Edison Int'l , 2018 WL 1367419 (S.D. Cal. Mar. 16, 2018). A corresponding judgment was entered on March 19, 2018. Id. (Dkt. 66). The plaintiff appealed the judgment approximately three weeks later. Id. (Dkt. 67). The appeal remains pending.
III. Analysis
A. General Legal Standards: Motion to Dismiss
Fed. R. Civ. P. 8(a) provides that a "pleading that states a claim for relief *1184 must contain ... a short and plain statement of the claim showing that the pleader is entitled to relief ...." The complaint must state facts sufficient to show that a claim for relief is plausible on its face. Bell Atl. Corp. v. Twombly , 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The complaint need not include detailed factual allegations, but must provide more than a "formulaic recitation of the elements of a cause of action." Id. at 555, 127 S.Ct. 1955. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft v. Iqbal , 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted).
Pursuant to Fed. R. Civ. P. 12(b)(6), a party may move to dismiss for failure to state a claim. It is appropriate to grant such a motion only where the complaint lacks a cognizable legal theory or sufficient facts to support one. Mendiondo v. Centinela Hosp. Med. Ctr. , 521 F.3d 1097, 1104 (9th Cir. 2008). In considering a motion to dismiss, the allegations in the challenged complaint are deemed true and must be construed in the light most favorable to the non-moving party. Cahill v. Liberty Mut. Ins. Co. , 80 F.3d 336, 337-38 (9th Cir. 1996). However, a court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit. Nor is the court required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." In re Gilead Scis. Sec. Litig. , 536 F.3d 1049, 1055 (9th Cir. 2008) (citing Sprewell v. Golden State Warriors , 266 F.3d 979, 988 (9th Cir. 2001) ).
B. Judicial Notice
Defendant has requested judicial notice of 10 documents. RJN, Dkt. 89. Plaintiff has not opposed this request. Fed. R. Evid. 201(b) permits judicial notice of any fact "not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot be questioned." A similar request for judicial notice of seven of these exhibits was granted in the prior orders on the motions to dismiss the Complaint and the FAC ("Prior Orders"). Dkts. 52, 80. For the reasons stated in the Prior Orders, judicial notice of these same exhibits is appropriate. Exhibit 8 is the transcript of the hearing in this action. Exhibit 9 is an analyst report quoted in the SAC and is similar to analyst reports of which judicial notice was taken previously. Exhibit 10 is a modified version of the share price data of which judicial notice was taken previously. For these reasons, judicial notice of these exhibits is appropriate, and the request for judicial notice is GRANTED . See, e.g. , Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist. , 498 F.3d 1031, 1039 n.2 (9th Cir. 2007) (judicial notice proper of the Supreme Court's oral argument in the case); In re Century Aluminum Co. Sec. Litig. , No. C-09-1001-SI, 2011 WL 830174, at *9 (N.D. Cal. Mar. 3, 2011), aff'd , 704 F.3d 1119 (9th Cir. 2013)and aff'd , 729 F.3d 1104 (9th Cir. 2013) ("[C]ourts routinely take judicial notice of analyst reports.").
C. Application
1. The Statutory Standards for Claims Brought Under ERISA
Section 404(a)(1)(A) of ERISA requires a fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and [ ] for the exclusive purpose of: providing benefits to participants and their beneficiaries;
*1185 and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Section 404(a)(1)(B) of ERISA requires that these duties be discharged "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." Id. § 1104(a)(1)(B).
2. Interpretation of the Statutory Standards When Maintaining Investment in Stock of Employer
The Supreme Court has established pleading standards for ERISA claims brought against an ESOP fiduciary. It crafted these rules in two cases in which plaintiffs, who were employees, alleged that fiduciaries, who were also employees of the same employer, breached their obligations under ERISA by imprudently managing investments in the stock of that employer. See Fifth Third Bancorp v. Dudenhoeffer , --- U.S. ----, 134 S.Ct. 2459, 189 L.Ed.2d 457 (2014) ; Amgen Inc. v. Harris , --- U.S. ----, 136 S.Ct. 758, 193 L.Ed.2d 696 (2016). Both cases involved allegations that the fiduciaries knew, or should have known, of certain actions by the employer that had not been disclosed publicly, and whose public disclosure would have an adverse effect on the price of the stock in which an ESOP had invested.
Fifth Third set forth the following pleading standard:
To state a claim for breach of the duty of prudence on the basis of inside information, a plaintiff must plausibly allege an alternative action that the defendant could have taken that would have been consistent with the securities laws and that a prudent fiduciary in the same circumstances would not have viewed as more likely to harm the fund than to help it.
134 S.Ct. at 2472.[2]
The Court explained that this standard was to be applied in light of several considerations. First , "the duty of prudence ... does not require a fiduciary to break the law" by "divesting [a] fund's holdings of the employer's stock on the basis of inside information." Id. Second , courts should "consider the extent to which an ERISA-based obligation either to refrain [from trading] or to disclose inside information to the public could conflict with the complex insider trading and corporate disclosure requirements imposed by the federal securities laws or with the objectives of those laws." Id. at 2473. Third , courts should consider "whether the complaint has plausibly alleged that a prudent fiduciary in the defendant's position could not have concluded that stopping purchases-which the market might take as a sign that insider fiduciaries viewed the employer's stock as a bad investment-or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund." Id.
Fifth Third also held that a motion to dismiss a complaint by applying this standard is an "important mechanism for weeding out meritless claims." Id. at 2471. The Court directed courts to engage in "careful, context-sensitive scrutiny of a complaint's allegations" and "careful judicial consideration of whether the complaint states a claim that the defendant acted imprudently." Id. at 2470-71.
Amgen presented similar issues. There, the plaintiffs alleged that Amgen fiduciaries *1186 breached their duties of prudence by allowing defined contribution plans to purchase and hold their employer's stock. The predicate of the claim was that the fiduciaries allegedly knew that the price of the stock was artificially inflated due to improper, off-label drug marketing and sales efforts. Among other things, it was alleged that Amgen had engaged in extensive marketing, encouraging both "on- and off- label uses" of certain of its drugs. 788 F.3d 916, 931 (9th Cir. 2015). After these and other matters were disclosed publicly, Amgen stock declined in value. Id. at 924.
The Ninth Circuit determined that it was plausible that the Amgen fiduciaries "knew or should have known that the Amgen Common Stock Fund was purchasing stock at an artificially inflated price due to material misrepresentations and omissions by company officers." Id. at 921 (emphasis in original). The opinion made clear that the obligation of a fiduciary to act is triggered only if he or she knows or should know of a violation of securities laws. This standard is not met when a fiduciary "only ... suspect[s]" such a violation. Id. Amgen also emphasized that, in a parallel securities class action that arose out of the same underlying allegations as to the inflated stock price, the district court concluded that the investors sufficiently alleged material misrepresentations and omissions, scienter, reliance and resulting economic loss to state claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a). Id. at 920. In light of this, the Ninth Circuit determined that the plaintiffs stated a duty of prudence claim under Fifth Third because, inter alia , it was "plausible" that "defendants could remove the Fund from the list of investment options without causing undue harm to plan participants." Id. at 938.
The Supreme Court reversed. It determined that the Ninth Circuit erred by failing to assess whether the complaint plausibly alleged that a prudent fiduciary in the same position as defendants "could not have concluded" that the alternative action-removing the Amgen common stock fund from the list of investment options of the relevant plan-"would do more harm than good." Amgen , 136 S.Ct. at 760. The Court accepted the possibility that "removing the Amgen Common Stock Fund from the list of investment options" might be "an alternative action that could plausibly have satisfied Fifth Third 's standards." Id. Nevertheless, the Court concluded that plaintiffs had failed to plead "facts and allegations supporting that proposition." Id. ("The Ninth Circuit's proposition that removing the Amgen Common Stock Fund from the list of investment options was an alternative action that could plausibly have satisfied Fifth Third 's standards may be true. If so, the facts and allegations supporting that proposition should appear in the stockholders' complaint. Having examined the complaint, the Court has not found sufficient facts and allegations to state a claim for breach of the duty of prudence.").
Three other Circuit Court decisions addressed Fifth Third 's"more harm than good" standard in detail. In Whitley v. BP, P.L.C. , the Fifth Circuit held that allegations in the complaint did not satisfy the standard of Fifth Third because "the stockholders do not specifically allege, for each proposed alternative, that a prudent fiduciary could not have concluded that the alternative would do more harm than good, nor do they offer facts that would support such an allegation." 838 F.3d 523, 529 (5th Cir. 2016). Because the alternative actions proposed by the shareholders-disclosure of the fraud to the public or freezing trades of BP stock, "would likely lower the stock price," a prudent fiduciary "could very easily conclude that such actions would do more harm than good." Id. (emphasis *1187 in original). Similarly, the Second Circuit affirmed the dismissal of the complaint in which the allegations were "wholly conclusory" as to whether a prudent fiduciary could not conclude that freezing purchases of stock or disclosing the alleged fraud would cause the fund more harm than good. Loeza v. John Does 1-10 , 659 Fed. Appx 44, 46 (2d Cir. 2016). The complaint alleged that that the "fact" that "disclosing a fraud always causes a company's stock price to drop" does not "justif[y] perpetuating a fraud" because "the longer a fraud goes on, the more painful the correction w[ill] be." In re JPMorgan Chase & Co. Erisa Litig. , No. 12 Civ. 04027 (GBD), 2016 WL 110521, at *2 (S.D.N.Y. Jan. 8, 2016) (emphasis in original). These assertions were "not particular to the facts of this case and could be made by plaintiffs in any case asserting a breach of ERISA's duty of prudence. They amount to no more than factors Defendants might have considered when deciding whether to make public disclosure." Id. Finally, in Saumer v. Cliffs Natural Resources, Inc. , the Sixth Circuit held that the complaint did not satisfy Fifth Third
Cliffs's fiduciaries could have concluded that divulging inside information about the Bloom Lake Mine would have collapsed Cliffs's stock price, hurting participants already invested in the ESOP. And closing the fund without explanation might be even worse: "It signals that something may be deeply wrong inside a company but doesn't provide the market with information to gauge the stock's true value." Amgen , 788 F.3d at 925-26 (Kozinski, J., dissenting from denial of reh'g en banc).
853 F.3d 855, 864 (6th Cir. 2017).
3. Whether the SAC is Sufficient
a) The FAC and Prior Order
The FAC alleged that Edison operated in an "efficient market," Defendants were familiar with the efficient-markets theory and Edison's stock price was artificially inflated by the alleged fraud. FAC, Dkt. 53 ¶¶ 105-06. It alleged that once Defendants became aware of the alleged fraud, they knew or should have known that "eventually, the stock price would be corrected, because no fraud can last forever" and "the longer Edison's fraud persisted ... the worse the correction of its stock price would be." Id. ¶¶ 106-07. It alleged that there were two alternative actions Defendants could have taken consistent with the federal securities laws that a prudent fiduciary in the same circumstances could not have viewed as ones that were more likely to harm than help the fund.
In the first alternative, Defendant Boada could have made corrective disclosures to the public, or have caused such disclosures by providing the necessary information to the executives at Edison with the authority to do so. Such disclosures would have allowed market forces to cause the price of Edison stock to decline to its true value. In describing this alternative, the FAC alleges that Defendant Boada "could have sought to tell the public the truth." Id. ¶ 25. As to the second alternative, the FAC alleged that Defendants could have prevented new investments in the Stock Fund by discontinuing both the purchase and sale of the stock until the value of the Stock Fund was no longer inflated, i.e. , after the market became aware of the actual, lower value of Edison stock. Id. ¶ 29.
In sum, the FAC alleged that Defendants could not reasonably have concluded that taking action would have done more harm than good. The basis for this allegation was that disclosure of the fraud would have resulted in the price of the stock falling to its true value. Plaintiffs contend that this could not be considered a harm to those who were already participants in the *1188 Stock Fund because it was inevitable that the stock price would fall once the fraud was disclosed.
As noted in the Prior Order, the allegations in the FAC did not satisfy the ERISA pleading standard. The allegations regarding the efficient-markets theory and Defendants' alleged knowledge of it did not meet the pleading standard of Fifth Third or account for the possibility of harm to other Plan members. The FAC also failed to account for the risk that the market might overact to the proposed public disclosure. This would have resulted in an undue decline in the price of the stock. Dkt. 80.
The prior Order stated that more specific factual allegations would be required to meet the standard of Fifth Third :
[T]he factual allegations in the FAC about the efficient-markets theory are not specifically tailored to this action. Fifth Third , 134 S.Ct. at 2473. They are framed in a manner that could apply to any similar ERISA claim.... To satisfy the Fifth Third standard, Plaintiff must allege specific facts related to the underlying conduct at issue here. The allegations must demonstrate why a prudent fiduciary under the circumstances presented in this action could not have concluded that disclosing fraud or freezing stock purchases would do more harm than good.
Dkt. 80 at 15.
b) The Allegations in the SAC
Plaintiff contends that the new allegations in the SAC satisfy the Fifth Third standards and cure what were deemed to have been deficiencies in the FAC. The new allegations in the SAC as to whether the Defendants could have concluded that disclosing the alleged fraud or freezing stock purchases would do more harm than good to the Stock Fund are as follows:
On March 27, 2014, Edison announced the SONGS Settlement. Defendant Boada knew or should have known at that time about the Company's undisclosed ex parte communications with the CPUC. The public did not know about these communications or the risk they posed to the Settlement, so Edison's stock price began to trade at a higher value as a result. Defendant Boada, recognizing this disparity between what he knew as a senior corporate insider and what the public knew, should have understood that this disparity would result in the artificial inflation of Edison's stock price. Boada, after all, was a highly sophisticated, experienced executive with decades of experience in corporate finance, and the premise that false perception by the public regarding a publicly-traded company causes the company's stock to inflate artificially is a rather basic one.
Boada could have approached Craver and possibly others and entreated them to disclose the undisclosed ex parte communications to correct the public's misapprehension of Edison's value. As of March 31, 2014, Edison's adjusted stock price close was $52.18, not even a full three dollars higher than it had been on March 27, the first day of the Class Period. In other words, very little artificial inflation of Edison's stock had yet taken place. Very few Plan participants had yet had the opportunity to purchase Stock Fund shares at artificially high prices. Corrective disclosure at this time, under basic efficient-market theory, would only have reduced Edison's stock price back to its pre-inflation level-about $49 a share-and the damage to Plan participant purchasers would have almost been completely avoided.
Boada would have had no reason at that time to fear an overcorrection of Edison's stock price, particularly because *1189 the fraud had only been extant for a very short period of time. If anything, the public would have been more likely to view the misrepresentation as a forgivable error than as part of a reputation-harming fraud perpetrated on investors.
Boada also could have chosen to do nothing at that time (in fact, that is exactly what he did). As time passed, however, he would have noticed that Edison's stock price was rising higher and higher while its improper ex parte communications remained undisclosed. As of June 19, 2014, the adjusted closing price of Edison's stock was $53.31; on August 29, 2014, it was $54.85; on November 20, 2014, it had climbed to $58.10; in December 2014, it passed $60 a share, peaking in the mid-60s in January and early February 2015. During this time, the public believed the SONGS Settlement was secure and that Edison's problems in connection with it were in the rearview mirror getting smaller and smaller.
But the higher Edison's stock price climbed without any of the truth about the Company's ex parte communications emerging, the more concerned Boada should have been. After all, the higher the stock price was, the further it would have to fall when the truth came out. Whereas on March 31, 2014, corrective disclosure would have resulted in, at worst, a $3 price correction, on January 30, 2015, the same corrective disclosure would have resulted in a potential $15 price correction because Edison's stock was trading at $64.00.
Defendant Boada was not required to see the future, but as a prudent fiduciary, he should have been able to pay attention to the recent past. And, seeing that Edison's stock was continually rising over the first 10 months of the Class Period, he should have recognized that a sooner disclosure at a lower stock price would result in a softer correction, and therefore less harm to Plan participants, than would a later disclosure at a higher stock price.
Starting February 9, 2015, the truth about Edison's misconduct began to emerge, albeit in dribs and drabs instead of all at once. Each of these mini-revelations resulted in a partial correction of Edison's stock price. Boada should have recognized, as a prudent fiduciary, that allowing the stock to be corrected in piecemeal fashion was worse for Plan participants than a single, fulsome correction earlier on would have been, because the more prolonged the fraud was, the greater the damage to Edison's reputation for trustworthiness, and thus the harsher a correction that occurred.
Other factors should have compelled Boada to support earlier disclosure as well. Price is not the only way of measuring the risk of a publicly-traded stock. As an experienced financial executive, not to mention a CFA, Boada should have understood that there are relevant proxies one can look at if one wants to understand the underlying volatility and risk of a stock that one is supposed to be monitoring.
For example, the implied volatility of Edison options is a good indicator of how the market viewed the overall risk of Edison. The greater the implied volatility as reflected in the performance and trading of Edison options, the more risky the market could be said to have viewed Edison.
Throughout the Class Period, the implied volatility of Edison options steadily increased. At the beginning of the Class Period, it hovered around 16; through the fall of 2014, it rose modestly to 17 or 18. Then the implied volatility began to climb higher, hitting (and surpassing) 20 in October 2014. After the truth about *1190 Edison's ex parte communications began to emerge in February 2015, the implied volatility for Edison shot above 20 and stayed there, hitting 20.85 on February 9, 2015, rising above 21 in March and April 2015, and hitting a peak of 24.44 on May 7, 2015, and remaining above 20 for the remainder of the Class Period.
Defendant Boada should have understood the significance of this steady increase in implied volatility-the greater the increase, the more volatile and risky Edison common stock was, and thus the more likely a stock-price correction would be harsher.
Had the overall trend in Edison's implied volatility during the Class Period been in the opposite direction, defendant Boada might have been able to make a reasonable argument that holding off corrective disclosure was the better option-the one likely to cause less harm to Plan participants-because the harshness of the stock-price correction was likely softening. But the trend of increasing implied volatility was a clear signal to Boada that acting sooner to correct Edison's fraud was likely to cause less harm than acting later would.
Similarly, Edison's bonds decreased in price over the course of the Class Period, beginning at a price of around 106 and decreasing to about 104 by the end of the Class Period. The Corporate Bond Index, which rose, and comparable maturity Treasury Note remained relatively constant, and thus did not experience similar declines during that period, meaning that Edison's decline was not part of some industry-wide or other larger general economic trend; it was specific to Edison.
Edison's declining bond price was another indicator of growing underlying corporate risk at Edison. This trend, combined with the trend of increasing implied volatility, was a clear indication to any prudent fiduciary that any stock-price correction that Edison experienced was going to be more severe as the bond price dropped and the implied volatility rose. These factors should also have caused defendant Boada to seek to make an earlier corrective disclosure in order to cause Plan participants the least amount of harm.
Defendant Boada, as an experienced executive with a deep background in finance, should also have understood that, the longer Edison's fraud went on, the more damage would be done to the Company's reputation when the truth emerged. Here, that is exactly what happened-for a good six months after the truth about Edison's misconduct had fully emerged in late June 2015, Edison's stock price remained flat (or declined even further). Analysts at the time suggested that this stock price drop was an "overcorrection," that it was disproportionate to the loss in company value that should have been reflected in Edison's stock price. For example, on June 25, 2015, the day after the end of the Class Period, an analyst report issued by SunTrust Robinson Humphrey stated, "We believe EIX's 3% stock decline yesterday (in response to the consumer group, TURN's, decision to support a petition to reopen the SONGS settlement) is an overreaction." The same report noted that "EIX is currently trading at a 2% discount to the peer group (based on our 2017 estimates)."
A June 25, 2015 analyst report from UBS, responding to the stock drop, stated that a "positive view" of Edison was still appropriate. The stock drop was "about public perception" of Edison and the SONGS Settlement, and not about the fundamental value of the Company. A July 1, 2015 report from RBC Capital Markets was similarly bullish on Edison, calling the Company "one of the best *1191 ways to play the 'grid of the future' story."
That Edison was still largely viewed as a solid company with a bright future, but whose stock price nevertheless declined or remained flat for at least six months after the revelation of its fraud, is strong evidence that the hit Edison took in the stock market was largely about damage to its credibility and reputation. Had defendant Boada tried to effectuate corrective disclosure at an earlier date, some, or perhaps all, of that reputational damage could have been mitigated or avoided altogether.
No prudent fiduciary, armed with all of the above information-all of which was knowable by defendants at the time-could possibly have concluded that Plan participants would be better served by a delayed disclosure and a prolonged fraud. Earlier corrective disclosure based on these specific facts would not-could not-have done "more harm than good" to the Plan or its participants.
SAC ¶¶ 118-135.
These arguments apply with equal force to the secondary option of closing the Stock Fund to new investments until the artificial inflation ended. Given the increasing implied volatility and decreasing bond prices, as well as the reputational damage that a longer fraud would cause, a cessation of trading at an earlier time, even if it necessitated some public disclosure about the fact of the cessation, could not reasonably be believed to be likely to cause "more harm than good" to Plan participants. The rising inflation of Edison's stock price, coupled with the increasing risk as reflected in options and bond trading, should have made it clear that earlier action was better than no action; any stock-price drop that might have resulted from the temporary closing of the Stock Fund would be less than the stock-price drop that ultimately occurred after an unnecessarily prolonged and reputation-damaging fraud.
SAC ¶ 139.
Plaintiff contends that these allegations are specific as to the claim that Defendants knew or should have known of certain facts that would have led a prudent fiduciary in the same position to conclude that "earlier disclosure of Edison's fraud would do less harm than later disclosure." Dkt. 93 at 9. Plaintiff adds that the SAC plausibly alleges two alternatives that were available to Defendants. It is alleged that each would have been consistent with the securities laws, and that a prudent fiduciary in the same circumstances would not have viewed either as more likely to harm the fund than to help it. First , Boada could have brought the alleged fraud to the attention of Edison executives who had reporting responsibilities under the federal laws or could have made the corrective disclosure himself if Edison executives failed to do so in response to his notification. SAC ¶¶ 27, 28, 50, 119. Second , Boada could have closed the Stock Fund to new investments until the stock price returned to a level no longer a product of the artificial inflation. Id. ¶¶ 36, 139.
Plaintiff cites certain of the new allegations in the SAC in support of her position that these options satisfy the Fifth Third pleading standard. They are as follows: (i) if Boada had disclosed the alleged fraud near the beginning of the Class Period, nearly all of the harm could have been avoided because little artificial inflation in Edison's stock price had occurred at that time, and there would have been no further inflation, SAC ¶¶ 119-20; (ii) as long as the fraud continued, Edison's stock price would continue to rise and "the further it would have to fall" when the fraud was disclosed and the stock price corrected, id. ¶¶ 121-22; (iii) if Boada had corrected the fraud through a one-time, comprehensive *1192 disclosure instead of piecemeal disclosures, it would have mitigated the harm to plan members, id. ¶ 124; (iv) because the implied volatility of Edison's stock increased over the Class Period, Boada should have been aware of that fact and that a later, corrective disclosure would cause greater harm, id. ¶¶ 126-27, 129; (v) the decrease in Edison's bond prices over the Class Period, when coupled with the increased volatility in Edison's stock, would have led a prudent fiduciary to conclude that the longer he or she waited to make a corrective disclosure, the more harm such a disclosure would cause, id. ¶¶ 130-31, and (vi) Boada should have recognized that market overreaction to corrective disclosures tends to become more likely the longer the fraud is prolonged. Id. ¶¶ 132-34.
As noted in the Prior Order, the analytical framework established in Fifth Third recognized that the decrease in value of a stock-even if a result of an improperly inflated price-was a harm that a prudent fiduciary could properly weigh in making an investment decision. Fifth Third , 134 S.Ct. at 2473 (a prudent fiduciary might conclude that "stopping purchases ... or publicly disclosing negative information would do more harm than good to the fund by causing a drop in the stock price and a concomitant drop in the value of the stock already held by the fund"). Here, prudent fiduciaries in the same position as Defendants could have viewed both of the alternative actions Plaintiff contends Defendants could have taken-immediate public disclosure or closing the Stock Fund to new investments-as more likely to harm the fund than to help it.
The SAC fails to allege that a prudent fiduciary could not have concluded that deferring a disclosure until after the completion of investigations into the nature of the alleged fraud or the degree to which the alleged fraud affected the stock price would cause more harm than good. See Price v. Strianese , No. 17-CV-652 (VEC), 2017 WL 4466614, at *7 (S.D.N.Y. Oct. 4, 2017) (a prudent fiduciary could easily conclude that corrective disclosure would cause more harm than good where, "as here, the disclosure would have been made before the company had an opportunity to investigate the issue that would have been disclosed"). It is insufficient that the SAC offers some "insight into how far the stock price would have dropped if disclosure was made earlier," Jander v. Ret. Plans Comm. of IBM ("Jander II "), 272 F.Supp.3d 444, 450 (S.D.N.Y. 2017), by alleging that "[w]hereas on March 31, 2014, corrective disclosure would have resulted in, at worst, a $3 price correction, on January 30, 2015, the same corrective disclosure would have resulted in a potential $15 price correction because Edison's stock was trading at $64.00." SAC ¶ 122. Even if Edison's stock price would have "dropped marginally as a result of a corrective disclosure, the net effect of that drop ... could have been substantial," causing substantial harm to plan members. Jander II, F. Supp. 3d at 450; see also Saumer , 853 F.3d at 864 ("Cliffs's fiduciaries could have concluded that divulging inside information about the Bloom Lake Mine would have collapsed Cliffs's stock price, hurting participants already invested in the ESOP.").
The SAC includes several, context-specific allegations regarding the volatility of the price of Edison's stock and bonds. The SAC alleges, for example, that "[t]hroughout the Class Period, the implied volatility of Edison options steadily increased" from "around 16" at the beginning of the Class Period, to 17 or 18 "through the fall of 2014" and hit 20 in October 2014. SAC ¶ 127. The SAC also alleges that Edison's bonds "decreased in price over the course of the Class Period, beginning at a price of around 106 and decreasing to about 104 by *1193 the end of the Class Period." Id. ¶ 130. However, the SAC makes only conclusory allegations that Defendants could not have concluded that immediate disclosure would have caused more harm than good even if Defendants were aware of or should have been aware of these alleged facts. See id. ¶ 131 ("Edison's declining bond price .... combined with the trend of increasing implied volatility, was a clear indication to any prudent fiduciary that any stock-price correction that Edison experienced was going to be more severe as the bond price dropped and the implied volatility rose.").
The conclusory allegations in the SAC about the inevitable harm caused by an undisclosed fraud are also insufficient to satisfy the Fifth Third standard. See Amgen , 788 F.3d at 938 ("That is, when the previously concealed material information about the company is eventually revealed as required by the securities laws, the stock price will inevitably decline, almost certainly by more than the amount it would have declined as a result of merely withdrawing the Fund as an investment option."), cert. granted, judgment rev'd , Amgen , --- U.S. ----, 136 S.Ct. 758, 193 L.Ed.2d 696 (2016). "[C]ourts have routinely rejected the allegation that the longer a fraud goes on, the harsher the correction as support for corrective disclosure as a plausible alternative." Jander II , 272 F.Supp.3d at 449.
Further, the allegations in the SAC regarding inevitable harm do not withstand the "context-sensitive scrutiny" under Fifth Third . They are framed in a manner that could apply to any similar ERISA claim. 134 S.Ct. at 2470 ; see SAC ¶ 119 (on the first day of the Class Period, "very little artificial inflation of Edison's stock had yet taken place.... Corrective disclosure at this time, under basic efficient-market theory, would only have reduced Edison's stock price back to its pre-inflation level ... and the damage to Plan participant purchasers would have almost been completely avoided"); id. ¶ 123 (Boda "should have recognized that a sooner disclosure at a lower stock price would result in a softer correction, and therefore less harm to Plan participants, than would a later disclosure at a higher stock price"); id. ¶ 122 ( [T]he higher the stock price was, the further it would have to fall when the truth came out."); id. ¶ 128 ("Defendant Boada should have understood the significance of this steady increase in implied volatility-the greater the increase, the more volatile and risky Edison common stock was, and thus the more likely a stock-price correction would be harsher."). The allegations in the SAC regarding reputational damage are also generic. Graham v. Fearon , No. 16-CV-2366, 2017 WL 1113358, at *5 (N.D. Ohio Mar. 24, 2017) (plaintiffs' claim that "reputational damage to [defendant] for engaging in prolonged fraud caused the stock to suffer a harsher correction in price than it would have if the alleged fraud had been disclosed at the outset" was not particular to the facts of the case).
Nor does the SAC present any context-specific allegations that could plausibly support another necessary finding. Thus, it fails to allege that a reasonably prudent fiduciary would not decide that, if the Stock Fund were closed to new investments until the artificial inflation ended, it would more likely cause harm than good to the fund. See Saumer , 853 F.3d at 864 ("And closing the fund without explanation might be even worse: 'It signals that something may be deeply wrong inside a company but doesn't provide the market with information to gauge the stock's true value.' " (quoting Amgen , 788 F.3d at 925-26 (Kozinski, J., dissenting from denial of reh'g en banc) ); Jander II , 272 F.Supp.3d at 452 ("Moreover, the Complaint overlooks the possibility that halting trades 'could send mixed signals,' such as diminished *1194 confidence in IBM stock, 'causing a drop in stock price' that could have done more harm than good to the Fund."). "This alternative has been consistently proposed post Fifth Third and has been consistently rejected in light of Fifth Third's requirement that the plaintiff allege that a prudent fiduciary could not have concluded that the alternative action would do more harm than good." Price , 2017 WL 4466614, at *6.
The Fifth Third standard is difficult to meet. See Jander v. Int'l Bus. Mach. Corp. ("Jander I "), 205 F.Supp.3d 538, 545 (S.D.N.Y. 2016) (recent cases "confirm that this is a highly exacting standard which is difficult to satisfy"); In re Wells Fargo Erisa 401(k) Litig. , No. 16-CV-3405 (PJS/BRT), 2017 WL 4220439, at *2 (D. Minn. Sept. 21, 2017) ("[T]his is a very tough standard .... plaintiffs will only rarely be able to plausibly allege that a prudent fiduciary 'could not' have concluded that a later disclosure of negative inside information would have less of an impact on the stock's price than an earlier disclosure."). "Indeed, the vast majority of ERISA duty of prudence claims brought against ESOPs since Fifth Third have foundered on the pleading requirements." Price , 2017 WL 4466614, at *5. However, as one District Court has explained
that only an extremely narrow category of ESOP fiduciary duty claims based on failure to disclose nonpublic information may survive is not particularly troubling. An ESOP fiduciary duty claim based on the failure to disclose adverse information targets ... generally the same conduct as a securities claim for material misstatements, but "ERISA and the securities laws ultimately have differing objectives pursued under entirely separate statutory schemes[ ] such that alleged securities law violations do not necessarily trigger a valid ERISA claim."
Id. at *8 (quoting Jander I , 205 F.Supp.3d at 546 ).
* * *
For the foregoing reasons, the SAC fails to state a claim against Defendant Boada. As Plaintiff concedes, "if [her] claim against Defendant Boada is dismissed, then her claim against Defendant Craver should be dismissed as well." Dkt. 93 at 23. Therefore, the Motion is GRANTED as to Defendant Boada and Defendant Craver.
4. Whether Leave to Amend Should Be Granted
Defendants argue that the dismissal should be with prejudice because Plaintiff has had two opportunities to cure the deficiencies in the pleadings. Salameh v. Tarsadia Hotel , 726 F.3d 1124, 1133 (9th Cir. 2013) (denial of leave to amend proper where "the district court gave Plaintiffs specific instructions on how to amend the complaint, and Plaintiffs did not comply"). Although the remaining deficiencies in the SAC parallel those in the FAC, leave to amend is to be freely granted. Here, Plaintiff has attempted to remedy some of the deficiencies identified in the prior Order by presenting context-specific amendments. Although these allegations were insufficient, leave to amend is appropriate if Plaintiff has a good faith basis for alleging additional specific facts related to the underlying conduct at issue here sufficient to satisfy the Fifth Third standard as discussed in this Order. Jander I , 205 F.3d at 546 (granting leave to amend "to provide facts of ... greater specificity ... and possibly retaining an expert to perform a quantitative analysis to show more precisely how Plan participants are harmed in the short and long term by purchasing Fund shares at artificially high prices"). Therefore, Plaintiff is given a final opportunity to seek to state a claim.
*1195 IV. Conclusion
For the reasons stated in this Order, the Motion is GRANTED , without prejudice. Any amended complaint shall be filed no later than June 19, 2018, with a response to the amended complaint to be filed by July 3, 2018.
IT IS SO ORDERED .

Plaintiff voluntarily dismissed Edison as a Defendant. Dkt. 38.

Fifth Third rejected a "presumption of prudence" standard that had been adopted by certain Circuits. Id. at 2463 ("We hold that no such presumption applies. Instead, ESOP fiduciaries are subject to the same duty of prudence that applies to ERISA fiduciaries in general, except that they need not diversify the fund's assets.").